UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

BAY STREET ADVISORS, LLC,

       Plaintiff,

   v.

KEVIN P. MAHONEY,

       Defendant.

24-CV-9139 (RA)

<u>OPINION & ORDER</u>

---

RONNIE ABRAMS, United States District Judge:

  After Defendant Kevin P. Mahoney left his position at Bay Street Advisors ("BSA"), to work for Christoph Zeiss Partners ("CZP"), BSA brought this action against him alleging trade secret violations, breach of contract regarding his employment and non-disclosure agreements, and breach of fiduciary duty. *See* Dkt. No. 1 ("Compl.") ¶¶ 2–4, 67–90. Mahoney denied the allegations and, in response, asserted contract and quasi-contract counterclaims relating to his Resignation Transition Plan and Agreement, which governed his offboarding from the company. *See* Dkt. No. 19 ("Countercls.") ¶¶ 170–85. On February 7, 2025, BSA filed a partial motion to dismiss Mahoney's quasi-contract claim pursuant to Federal Rule of Civil Procedure 12(b)(6), and moved to strike several allegations in Mahoney's Counterclaims as "impertinent and scandalous." Dkt. No. 24 ("BSA's Br.") at 1. For the reasons set forth below, BSA's motion to dismiss Mahoney's quasi-contract claim is denied, as is its motion to strike.

**BACKGROUND**

  The following facts are taken from the Complaint and Counterclaims, along with the documents attached to the Counterclaims. Facts asserted in the Counterclaims are assumed to be true for purposes of deciding this motion, *see e.g.*, *Ide v. Brit. Airways PLC*, 529 F. Supp. 3d 73, 78 (S.D.N.Y. 2021), while information from the Complaint provides background and context.

In 2009, Mahoney joined BSA, an executive search and consultancy firm that places job candidates in the financial services industry, where he worked as the Partner and Head of Investment Banking and Private Credit Practices. *See* Dkt. No. 19 ("Answer") ¶ 3. On February 29, 2024, Mahoney met with Lawrence Baum, the Managing Partner and Principal of BSA, Countercls. ¶ 58, and informed him that he was resigning from BSA to take a new role as Managing Director of the Global Financial Services Practices at CZP. Answer ¶ 3; *see also* Countercls. ¶¶ 58, 60.

Mahoney had long sought equity partnership at BSA and due to his brewing concerns regarding Baum's alleged financial mismanagement of the company—which included Baum's purported misuse of a Paycheck Protection Program ("PPP") loan granted as part of the federal government's initiative to help small businesses cope with the COVID-19 pandemic, as well as Mahoney's suspicions that leadership was not taking his interest in equity partnership seriously— he had begun to consider leaving the firm in 2023. Countercls. ¶¶ 4, 45–47. Departing with him in 2024 were three members of Mahoney's "working group" at BSA—Joshua Robinson, Zachary Brenneman, and Susan Yie. *Id.* ¶ 61. He maintains that his aforementioned concerns about Baum and BSA were shared by the members of his working group and were central to their dissatisfaction and decision to depart BSA for CZP. *Id.* ¶¶ 61–62.

As part of his offboarding process, Mahoney and Baum agreed that Mahoney would help finish "eighteen live client engagements in process" ("Live Searches") in return for Mahoney's receipt of "40% of fees resulting from all successfully closed Live Searches." *Id.* ¶¶ 64–66. On April 2, 2024, Mahoney and BSA "entered into a Resignation Transition Plan and Agreement" to memorialize those terms. *Id.* ¶ 69; Dkt. No. 19 Ex. 5 ("Transition Agreement").

In the wake of Mahoney's departure, BSA claims to have "uncovered substantial evidence

that Mr. Mahoney orchestrated an extensive exfiltration of [its] confidential information and trade secrets." Countercls. ¶¶ 126. The company alleges that Mahoney violated both his Employment Agreement by soliciting its clients and his Non-Disclosure Agreement by soliciting its employees "on behalf of CZP" and taking and relying on confidential information to compete with BSA. Compl. ¶¶ 77–79. Finally, and for the same reasons, BSA contends that Mahoney violated his fiduciary duty to the company. *Id.* ¶¶ 82–90.

Mahoney denies BSA's allegations and asserts a quasi-contract claim regarding a third contract, the Transition Agreement, and BSA's alleged failure to pay him in full for the work he provided after his departure. He asserts that while he fully complied with the terms of the Transition Agreement, BSA has violated its terms by providing a 20% commission instead of the agreed upon 40% commission for three Live Searches, Countercls. ¶ 110, and deducting a "wholly extracontractual [r]esearch fee" of 2.5% "for all five of the completed Live Searches." *Id.* ¶¶ 108, 111, 122.[1] BSA does not dispute that it paid Mahoney only a 20% commission for several searches, but maintains that it was permitted to do so since Mahoney delegated the lion's share of the work to a BSA employee named John Gregory. *See* Countercls., Ex. 8 at 1 ("For the searches listed below, Mr. Mahoney effected a complete hand-off of the work to John Gregory. At no time after those hand-offs did BSA require him to continue working those searches toward their completion."). BSA further maintains that it was entitled to deduct a 2.5% research fee since "Mr. Mahoney [was] acting as an independent contractor under the Transition Agreement," and as such, was "expected to rely on his own resources in order to provide the services agreed-upon by the

---

[1] In addition to disputing that the Transition Agreement spoke to reduced commissions if he collaborated and 2.5% research fees for independent contractors, Mahoney also alleges that BSA imposed additional requirements on him that were not found in the contract including that he (1) refrain from notifying clients about his departure to CZP and (2) provide weekly updates on clients that Mahoney was working on. *See* Countercls. ¶¶ 79–82.

parties." Countercls. Ex. 8 at 2.

On November 27, 2024, BSA filed suit against Mahoney, alleging that Mahoney (1) violated the Defend Trade Secrets Act, (2) breached his Employment Agreement and Non-Disclosure Agreement, and (3) breached his fiduciary duty to BSA. Compl. ¶¶ 67–90. On January 24, 2025, Mahoney answered the Complaint, categorically denying BSA's allegations, and simultaneously filed the Counterclaims alleging (1) breach of contract with respect to the Transition Agreement (2) and unjust enrichment and quantum meruit in the alternative. Countercls. ¶¶ 170–85. On February 7, 2025, BSA filed a motion to dismiss Mahoney's quasi-contract claim for unjust enrichment and quantum meruit, and a motion to strike paragraphs 2, 3, 23, 25–45, 47–50, and 161–63 of Mahoney's Counterclaims pursuant to Fed. R. Civ. P. 12(f), on the grounds that these allegations are "impertinent and scandalous." *See* BSA's Br. at 6.

## LEGAL STANDARD

In order to survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007)). [2] The factual matter is sufficient if it "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* Rule 12(b)(6) "applies equally to claims and counterclaims; therefore, a motion to dismiss a counterclaim is evaluated under the same standard as a motion to dismiss a complaint." *Gerdau Ameristeel U.S. Inc. v. Ameron Int'l Corp.*, No. 13-CV-7169, 2014 WL 3639176, at *2 (S.D.N.Y. July 22, 2014).

In reviewing a motion to dismiss a counterclaim under Rule 12(b)(6), the Court must accept all factual allegations in the counterclaim as true and draw all reasonable inferences in the

---

[2] Unless otherwise indicated, this memorandum opinion and order omits all internal quotation marks, citations, footnotes, omissions, emphases, and alterations in quoted text.

counterplaintiff's favor. *See Forest Park Pictures v. Universal Television Network, Inc.*, 683 F.3d 424, 429 (2d Cir. 2012). However, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft,* 556 U.S. at 678.

In addition to the allegations in a counterclaim, a court may consider "documents attached to the complaint as an exhibit or incorporated in it by reference, . . . matters of which judicial notice may be taken, or . . . documents either in plaintiffs' possession or of which plaintiffs had knowledge and relied on in bringing suit." *Brass v. Am. Film Techs., Inc.,* 987 F.2d 142, 150 (2d Cir. 1993). "Even where a document is not incorporated by reference, the court may nevertheless consider it where the complaint relies heavily upon its terms and effect, which renders the document integral to the complaint." *Chambers v. Time Warner, Inc.,* 282 F.3d 147, 153 (2d Cir. 2002).

Under Federal Rule of Civil Procedure 12(f), a court may, in its discretion, "strike from a pleading . . . any redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. 12(f). Although "motions to strike are generally disfavored," they may be granted if "the matter asserted clearly has no bearing on the issue in dispute." *Long v. Marubeni Am. Corp.*, 406 F. Supp. 2d 285, 303 (S.D.N.Y. 2005).

## DISCUSSION

## I.    BSA's Motion to Dismiss Mahoney's Unjust Enrichment and Quantum Meruit Claim

Mahoney brings a claim for unjust enrichment and quantum meruit against BSA, alleging that BSA has refused to pay him the entire agreed upon commission for completion of several Live Searches and has deducted a 2.5% research fee from the total remuneration due to him under the Transition Agreement. Countercls. ¶¶ 108–124, 178–185. BSA says it was entitled to halve Mahoney's commissions after he handed off a substantial amount of work on the Live Searches to one of its employees, and that it was able to (but had not yet) deducted a research fee since

Mahoney now works as an independent contractor and is not entitled to BSA's internal resources.

The doctrines of unjust enrichment and quantum meruit are related, as a claim of quantum meruit is a means of remedying unjust enrichment. *See Alter v. Bogoricin,* No. 97 Civ. 662, 1997 WL 691332, at *10 (S.D.N.Y. Nov. 6, 1997). Both doctrines are quasi-contractual and, as such, apply only in the absence of an express agreement on the subject matter. *See id.; Clark-Fitzpatrick, Inc. v. Long Island R.R. Co.,* 521 N.Y.S.2d 653, 656 (1987) ("[T]he existence of a valid and enforceable written contract governing a particular subject matter ordinarily precludes recovery in quasi contract for events arising out of the same subject matter."). Moreover, under New York law, courts "may analyze quantum meruit and unjust enrichment together as a single quasi contract claim." *Mid–Hudson Catskill Rural Migrant Ministry, Inc. v. Fine Host Corp.*, 418 F.3d 168, 175 (2d Cir. 2005).

BSA challenges Mahoney's pleading on two bases. First, as an initial matter, it argues that the quasi-contract claim is not sufficiently pled in the alternative. Second, it insists that the existence of an express agreement between the parties precludes the quasi-contract claim. *See* BSA's Br. at 5; Dkt. No. 32 ("BSA's Reply") at 2–5. Both arguments are unpersuasive.

As to BSA's first argument, the Court finds that Mahoney's quasi-contract claim is sufficiently pled. Even where there is a contract between parties, a quasi-contract claim may be pled in the alternative "when the written argument, or lack thereof, does not cover the full scope of the dispute between the parties, or when the contract is not valid or enforceable." *See Gemma Power Sys., LLC v. Exelon W. Medway II, LLC*, No. 19 Civ. 705, 2019 WL 3162088, at *5 (S.D.N.Y. July 1, 2019). Although Mahoney admits that a valid, enforceable contract exists, he contests the scope of the Transition Agreement, thereby allowing for a quasi-contract claim. While BSA makes a fair point about whether Mahoney could have adhered to more procedural formalities

when drafting the alternative pleading,[3] the quasi-contract claim does allege facts that call into question the scope of the Transition Agreement and the issue at hand. In particular, Mahoney argues that the Transition Agreement does not bear upon whether he was entitled to his full commission if he shared work with BSA employees or whether BSA could deduct a research fee from his commission. *See* Countercls., Ex. 9 at 1–3, Ex. 8 at 1–2.

Having found that Mahoney sufficiently pled a claim in quasi-contract, the Court turns to whether the Transition Agreement covers the subject matter in dispute. BSA's Br. at 5; *Gemma Power*, 2019 WL 3162088, at *5; *see also Xeriant, Inc. v. XTI Aircraft Co.*, 762 F. Supp. 3d 345, 353 (S.D.N.Y. 2025). To decide this issue, the Court must determine whether it could look solely to the Transition Agreement to resolve Mahoney's allegations that BSA has underpaid him. BSA insists that it could, arguing "[t]here is no dispute as to the scope of the Transition Agreement—it applies to Live Searches." BSA's Reply at 3. In Mahoney's view, by contrast, there is a critical dispute about the Transition Agreement's scope; he argues that "at no point has BSA identified any language in the Transition Agreement to support its contractual interpretations, because there are none." Dkt. No. 29 ("Mahoney's Br.") at 8. Assuming all facts alleged in the quasi-contract claim to be true, the Court finds that the Transition Agreement as written is insufficient to resolve

---

[3] BSA asserts that in order for Mahoney to pursue his quasi-contract claim along with his breach of contract claim, he needed to do more to properly plead the quasi-contract claim in the alternative. *See* Reply at 2–3. Federal Rule of Civil Procedure 8 expressly authorizes pleadings in the alternative. *See* Fed. R. Civ. P. 8(a)(3), (d)(2). The Second Circuit has adopted a liberal approach to alternative pleadings under Rule 8(d), holding "that even where allegations are not specifically denominated as alternative claims Rule 8(d) offers sufficient latitude to construe separate allegations in a complaint as alternative theories, at least when drawing all inferences in favor of the nonmoving party." *Adler v. Pataki*, 185 F.3d 35, 41 (2d Cir. 1999); *see also Henry v. Daytop Vill.*, 42 F.3d 89, 95 (2d Cir. 1994); *G-I Holdings, Inc. v. Baron & Budd*, 238 F. Supp. 2d 521, 536 (S.D.N.Y. 2022) (stating that plaintiffs "need not use particular words to plead in the alternative" as long as "it can be reasonably inferred that this is what [it was] doing"). While BSA acknowledges that its "argument does not turn on Mahoney's failure to use the word 'alternative' in his pleading," it insists that the invocation of the Transition Agreement in Mahoney's pleadings is fatal to his quasi-contract claim. BSA's Reply at 2. The Court disagrees. A complaint or counterclaim's acknowledgment of a valid and enforceable agreement, either by direct reference or incorporation, does not doom a quasi-contract claim as long as the scope of the contract is also in dispute—as it is here.

the dispute over BSA's purported underpayment of Mahoney. Accordingly, BSA's motion to dismiss Mahoney's quasi-contract claim is denied. *See Frio Energy Partners, LLC v. Fin. Tech. Leverage, LLC*, 680 F. Supp. 3d 322, 339 (S.D.N.Y. 2023) (citing *Andritz Hydro Can., Inc. v. Rochester Gas & Elec. Corp.*, No. 20-CV-6772, 2021 WL 3115425, at *10 (W.D.N.Y. July 22, 2021) (denying motion to dismiss since it was not clear to the court that "any provisions of the Agreement clearly control[] the determination of whether Plaintiff can recover . . . losses").

### A.  Non-Exclusive Work

First, at this stage of the litigation, the Court agrees with Mahoney that the Transition Agreement does not resolve the parties' dispute as to whether BSA could reduce Mahoney's commissions when he did not perform all the work on the Live Searches himself. Mahoney alleges that BSA failed to pay him the agreed upon 40% commission on three Live Searches, because he allegedly failed to perform the work alone, and instead delegated it to John Gregory, a BSA employee. Countercls. ¶¶ 108, 116; *see also* Countercls., Ex. 8 at 1. In subsequent communications, BSA affirmed its position that in order for Mahoney to collect his full commission, he could not "hand off" the work on a given search to a BSA employee. BSA's Reply at 4; Countercls., Ex. 8 at 1 ("First, Mr. Mahoney is not entitled to a 60/40 fee allocation in connection with any searches that he handed off to a BSA employee. However, as a gratuity[,] BSA . . . has allocated to Mr. Mahoney 20% of the fees received for the searches listed below in accordance with standard BSA fee-sharing practices in like scenarios.").

In support of its claim that the Transition Agreement does in fact govern the dispute, BSA points to the following contractual language: "For all searches in which I am to continue working towards their completion." BSA's Reply at 4; Transition Agreement at 2. Nowhere does the Transition Agreement specify, however, that in order to receive his full commission, Mahoney had

to do all the work towards completion of the Live Searches himself. The Transition Agreement also fails to detail an alternative payment scheme that would be triggered should Mahoney delegate to others. Mahoney rightly underscored the absence of relevant contractual language in an email he wrote BSA stating, "As you no doubt are aware, the Agreement contains no provisions permitting BSA to unilaterally discount the fees it owes to Mr. Mahoney based on a self-serving determination that Mr. Mahoney 'handed off' work to a BSA employee." Countercls., Ex. 9 at 1–2.

The obligations set forth in the Transition Agreement are meager. At its core, it governs Mahoney's obligations to BSA after he left for his new position—establishing a staggered timeline to announce his departure, outlining retainers and placement fees, discussing ongoing and future search engagements, and setting expectations regarding Mahoney's professional and ethical obligations. *See generally* Transition Agreement. It then refers to an addendum entitled "Resignation A – Live Searches Worksheet," which lists all Live Searches that Mahoney was working on, as well as a separate attachment with the "confirmed and estimated fees and timelines for each search." Transition Agreement at 2. It also includes a provision that requires BSA to promptly inform Mahoney upon receipt of payments from clients and then disperse his commission within 30 days. *Id.* at 1–2. For any searches not outlined in the Live Searches Worksheet, but that "may arise from recent client meetings," or for which Mahoney would "be required to execute or assist in the execution," the parties agreed to a "separate fee sharing agreement on a per search basis" with the same proportional split. *Id.* at 2. None of these provisions decide the instant dispute.

Mahoney argues that BSA has attempted to add its desired conditions to the Transition Agreement after the fact, stating in email correspondence appended to the Counterclaims that, "as a gratuity, BSA has allocated to Mr. Mahoney 20% of the fees received for the searches listed

below in accordance with standard BSA fee-sharing practices in like scenarios." Countercls., Ex.
8 at 1. BSA refers to this obligation as a condition precedent, stating that, "Mahoney did not meet
a condition precedent to payment of commissions on three of the Live Searches." BSA's Reply at
2–3. The Court is unpersuaded.

　　BSA also urges the Court to view the case in light of its past decision in *Andrews v. Sotheby
International Realty, Inc.*, in which it granted a defendant's motion to dismiss quasi-contract
claims, despite identifying some ambiguity in the underlying agreement between the parties. *See*
No. 12-CV-8824, 2014 WL 626968, at *12 (S.D.N.Y. Feb. 18, 2024). There, the plaintiff had also
brought quasi-contract claims in the alternative, asserting that he continued to provide "brokerage
services" and close "pending transactions" that benefitted his former employers, but was not paid
his "nondiscretionary bonus." *Id.* at *11. Unlike here, in *Andrews*, in addition to admitting that
there was a valid and enforceable contract, the plaintiff also "allege[d] that [his] entitlement to a
bonus [was] governed by their agreement." *Id.* at *12. By contrast, the Court here finds no
comparable allegations or language in the Transition Agreement to guide its task of resolving the
dispute at hand.

　　The Second Circuit's decision in *Gould v. Lightstone Value Plus Real Estate Investment
Trust, Inc.* is instructive on this issue. 301 F. App'x 97, 99 (2d Cir. 2008) (summary order). In
addressing what was required to assess whether a contract governed the "same subject matter" as
the quantum meruit claim," the court in *Gould* stated that "[t]o determine that, as a matter of law,
the . . . contract provision covers the subject matter at issue . . . [the court] must find that the
language unambiguously covers this subject matter." *Id.* Where the contract language is
ambiguous, and "it is not clear whether the contract contemplates [the] particular factual scenario"
at issue, the quasi-contract claim must stand. *Id.* (reversing the district court's granting of

defendant's motion to dismiss as to the quasi-contract claim).

The Transition Agreement, like the contract in *Gould*, fails to address the factual scenarios that led to Mahoney's alleged underpayment. At most, it contains ambiguous provisions that, without more, do not aid the Court in resolving the instant dispute. *See Pauwels v. Deloitte LLP*, 83 F.4th 171, 188 (2d Cir. 2023) (reversing dismissal of unjust enrichment claim and holding that "because . . . there [was] a bona fide dispute as to whether the contract governed the subject matter underlying [appellant's] claim for unjust enrichment, . . . the existence of the contract [did] not preclude the unjust enrichment claim . . . at . . . the motion-to-dismiss stage").

The quasi-contract claim in *Joseph Sternberg, Inc. v. Walber 36th St. Associates* also serves as a useful analogue. 187 A.D.3d 225, 228 (App. Div. 1st Dep't 1993). There, plaintiff alleged that he did not receive a brokerage commission for the sale of a multi-million dollar building and brought claims based on breach of contract and quantum meruit. *Id.* at 227. The First Department found that the contract's scope did not "explicitly" cover the factual scenario that gave rise to the dispute. *Id.* at 228 ("Obviously, if the brokerage agreement at issue had explicitly stated that, in the event the sale did not proceed at the agreed price, plaintiff would not be entitled to any commission, it would be indisputable that nothing short of a sale at that price would entitle plaintiff to a commission."). Since the contract did "not so state," and was otherwise "silent as to the plaintiff's entitlement to a commission in the event a sale occurred for a lesser price," the court denied the motion to dismiss and allowed the quasi-contract claim to proceed. *Id.* at 228–29.

Similarly, in *Frio Energy Partners*, the quasi-contract claim survived despite the existence of an enforceable contract between the parties because the contract did "not speak to"—and in some respects was "entirely silent" as to—certain factual scenarios that came to pass. 680 F. Supp. 3d at 340; *see also In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 27 F. Supp. 3d 447, 483

(S.D.N.Y. 2014) (rejecting defendant's argument that it was sufficient that the "services provided by the defendant and remedy sought by the plaintiff were traceable to a contract," and instead requiring that the contract must "specifically and expressly contemplate[] the factual scenario alleged to exist").

Although BSA and Mahoney do not dispute "that certain provisions in the [Transition Agreement] bind the parties," those otherwise "enforceable provisions . . . do not clearly cover the dispute." *Frio Energy Partners*, 680 F. Supp. 3d at 340. In particular, the Transition Agreement does not address the specific factual scenario that purportedly occurred here—Mahoney handing off the work on several Live Searches to John Gregory. BSA further insists that explicitly adding language to the Transition Agreement detailing the parameters of a "counterparty's performance under a contract" would have been an unnecessary and potentially superfluous step. BSA's Reply at 4. However, in the absence of such language, the Court is left without contractual language to govern its resolution of the dispute.

The only potential reference to a fee arrangement between the parties, moreover, is found in Mahoney's Employment Agreement from 2009. *See* Countercls., Ex. 1 at 2. Under the subsection entitled "Commissions," the Employment Agreement states that employees who worked alone to place a candidate would receive their full commission. *Id.* at 3. If they collaborated, the employees would decide commission splits within ten days of placing the candidate. *Id.* "[I]n the absence of an agreement among the participating parties," BSA would "decid[e] splits," typically based on the employees' pro rata share proportional to the amount of work they put into a given placement. *Id.* at 3–4. However, this provision is found in a separate contract—one which BSA does not invoke in its attempt to locate contractual support for its position that the Transition Agreement governs. Furthermore, the Employment Agreement makes

clear that the "Commissions" subsection applies only to individuals who are "employed by Bay Street Advisors on the day such commission becomes due and payable." *Id.* at 3. No one disputes that Mahoney was no longer an employee of BSA at the time of the alleged breach. While the Transition Agreement states that Mahoney would continue "to be bound by the obligations in our Employment Letters and the BSA Handbook," Transition Agreement at 4, any question about whether the Employment Agreement was still relevant was put to bed in BSA's August 5, 2024 email to Mahoney stating that only the Transition Agreement could govern his ongoing work with BSA, given that Mahoney was no longer an employee. *See* Countercls., Ex. 8 at 1 ("Mr. Mahoney, as a non-employee, is not entitled to benefit from company policy and is instead held to the letter of the Transition Agreement (which he drafted and which must be construed against him).").

Given that the Employment Agreement does not govern, the Court is left only with the Transition Agreement, which lacks explicit language governing whether or not Mahoney was entitled to his full commission if he worked with others to complete a Live Search.

### B. Research Fee

The Transition Agreement also does not cover the parties' dispute as to whether BSA could deduct a research fee from Mahoney's commissions. Mahoney next alleges that BSA "would be further breaching its obligations under the Agreement by withholding an additional 2.5% in plainly extracontractual 'research fees.'" Countercls. ¶¶ 122. BSA responds that it is "entitled to deduct a 2.5% research fee" because "Mahoney [was] acting as an independent contractor under the Transition Agreement," though it maintains that it has not yet invoked that right. Countercls., Ex. 8. at 2; *see also* Countercls. ¶ 123. In its search for contractual language that governs this dispute, BSA asserts that the dispute turns on "Mahoney's role as a *contractor* under the *Transition Agreement*," and says that "[t]he contract will govern whether BSA's position is correct or not."

BSA's Reply at 4 (emphasis in original). As with the prior dispute, the Court fails to see explicit language in the Transition Agreement that governs the issue.

Notably, there is no language in the Transition Agreement that defines Mahoney as an independent contractor and no reference to any deduction he should thus expect on any earned commissions. *See* Countercls., Ex. 9 at 2 ("Unsurprisingly, BSA does not – because it cannot – identify any provision in the Agreement that would permit the research discount it now threatens. . . . [T]he plain language of the Agreement dictates that BSA must allocate to Mr. Mahoney 40% of all final fees associated with the searches."). The most pertinent language on this issue is the contract's characterization of Mahoney as "no longer a full-time employee of BSA." Transition Agreement at 2. The only reference to a research fee in the materials before the Court is found in the Employment Agreement. Countercls., Ex. 1 at 4. In a section entitled "Deductions," it states that "[i]n case [sic] where a Research Associate is utilized in the course of a search placement, 2.5% of gross commissions will be deducted to contribute to Research Associate bonuses." *Id.*[4] For reasons similar to those provided above, however, the Employment Agreement does not apply to Mahoney's work for BSA after he resigned. It is also unclear whether John Gregory, who the parties merely refer to as a BSA employee, would qualify as a "Research Associate" pursuant to the Employment Agreement. *See e.g.*, Countercls., Ex. 8 at 1.[5]

---

[4] It is notable that the post-hoc justification given by BSA in its email to Mahoney regarding the deduction focused on the expectation that a contractor "rely on his own resources," *see* Countercls., Ex. 8 at 2, rather than incentivizing employees' contributions to Research Associate bonuses, the rationale given in the Employment Agreement. *See id.*, Ex. 1 at 4.

[5] Mahoney also alleges that BSA notified him of several other requirements it claims stem from the Transition Agreement, and has threatened to withhold payment if he does not abide by at least one of those terms. *See* Countercls. ¶¶ 81–82. He asserts that Baum mandated that he refrain from sending emails and calling clients to apprise them of his move to CZP, *id.* ¶ 81, and required weekly updates on "any ongoing searches or any new searches." *Id.* ¶ 82. While the parties were less focused on these terms in their briefing, they are also clearly in dispute and as is true for all the contested provisions, the Transition Agreement does not speak to either term. The Court finds that they are outside the scope of the contract. *See e.g.*, *id.* ¶ 124 (alleging that "BSA also threatened non-payment of any fees if Mr. Mahoney failed to provide 'weekly updates,'" a requirement that Mahoney argues is "found nowhere in the Agreement").

For these reasons, at this stage of the litigation, the Court cannot conclude that the Transition Agreement clearly covers the present dispute over the payment of Mahoney's commission for completed Live Searches. Additionally, "because it is difficult to determine the validity or scope of the contract at the pleading stage," BSA's argument that the Transition Agreement governs the instant dispute is "premature." *See e.g. Xeriant*, 762 F. Supp. at 358; *Vertex Constr. Corp. v. T.F.J. Fitness LLC*, No. 10-CV-683, 2011 WL 5884209, at *4 (E.D.N.Y. Nov. 23, 2011). The Court sees no reason to extinguish Mahoney's claim at this early stage of litigation. Accordingly, BSA's motion to dismiss the quasi-contract claim is denied.

## II.      BSA's Motion to Strike

BSA also moves to strike several allegations made in Mahoney's Counterclaims. BSA organizes the allegations it wants stricken into three categories. *See* BSA's Br. at 6–12. The first are "[a]llegations of unrelated illegal conduct or mismanagement," the second is a single allegation of unrelated wage-and-hour violations; and the third are allegations regarding "character or speculati[on]" about the motivation for the alleged breach of contract and BSA's lawsuit as a whole. *Id.* at 10. For the reasons stated below, BSA's motion to strike the allegations is denied in its entirety.

"The standard to prevail on a motion to strike is demanding," and requires the movant to demonstrate that "(1) no evidence in support of the allegations would be admissible (2) that the allegations have no bearing on the issues in the case; and (3) that to permit the allegations to stand would result in prejudice to the movant." *Roe v. City of New York*, 151 F. Supp. 2d 495, 510 (S.D.N.Y. 2001) (quoting *Koch v. Dwyer*, No. 98-CV-5519, 2000 WL 1458803, at *1 (S.D.N.Y. Sept. 29, 2000)). As to the third prong, allegations are considered prejudicial when they are "amorphous, unspecific and cannot be defended against," and "harm [a defendant] in the public

eye and could influence prospective jury members" when publicized. *G-I Holdings*, 238 F. Supp.

at 556; *see also Low v. Robb*, No. 11-CV-2321, 2012 WL 173472, at *9 (S.D.N.Y. Jan. 20, 2012).

Before deciding whether to strike allegations, the issues relevant to the case "must first be

framed," in order to assess whether the challenged allegations are relevant to any of the claims.

*Kounitz v. Slaatten*, 901 F. Supp. 650, 658 (S.D.N.Y. 1995); *see also Burger v. Health Ins. Plan*

*of Greater N.Y.*, 684 F. Supp. 46, 52 (S.D.N.Y. 1988). Both the claims in the Complaint and the

Counterclaims are pertinent here. Since the allegations that BSA has moved to strike are found in

Mahoney's Counterclaims, the breach of contract and quasi-contract claim, as well as BSA's

underlying conduct regarding the Transition Agreement, are relevant. *See* BSA's Br. at 7; *Avnet,*

*Inc. v. Am. Motorists Ins. Co.*, 684 F. Supp. 814, 817 (S.D.N.Y. 1988). So too are BSA's claims

for breach of the Employment Agreement and Non-Disclosure Agreement, misappropriation of

trade secrets, and breach of fiduciary duty, along with the parties' underlying conduct. *See Arias-*

*Zeballos v. Tan*, No. 6-CV-1268, 2006 WL 3075528, at *10 (S.D.N.Y. Oct. 26, 2006) (while

"general allegations regarding defendant's wealth . . . are relevant to defendant's counterclaims . .

. allegations regarding defendant's personal affairs have no conceivable relationship to the merits

of any of the claims or counterclaims"). Because the allegations BSA seeks to strike bear on issues

relevant to the claims and quasi-contract claim in this case, its motion to strike is denied.

### A.  Allegations of Purportedly Unrelated Illegal Conduct or Mismanagement

BSA first seeks to strike portions of Mahoney's Counterclaims, which it describes as

"baseless allegations of gross mismanagement, wage-and-hour violations, or fraud unrelated to

either parties' claims." BSA's Br. at 7; Countercls. ¶¶ 2, 3, 23, 29, and 30–45. For context, the

Court briefly summarizes the content of the paragraphs BSA moves to strike.

Paragraphs 2, 29, and 45 include broad allegations of Baum's mismanagement of BSA's

finances. Countercls. ¶ 2 ("Mr. Mahoney became concerned about alarming indications that Mr. Baum was deliberately mishandling Bay Street's finances, possibly for his own benefit."); *id.* ¶ 29 ("Mr. Mahoney began to grow concerned that a significant issue with Bay Street's financial health may exist."); *id.* ¶ 45 ("Mr. Mahoney began to realize that, at minimum, Mr. Baum was poorly managing the company."). Paragraphs 3 and 30–45 detail Baum's alleged misuse of PPP funds, as one example of Baum's ongoing financial mismanagement of the company or fraud. *See e.g.*, *id.* ¶ 43 ("Mr. Mahoney . . . began to suspect that Mr. Baum was seeking to hide his deliberate mishandling of the PPP loan proceeds."); *id.* ¶ 37 ("[A]lthough most of PPP Loan I was earmarked for 2020 'payroll,' and despite that Bay Street remained profitable that year, Mr. Baum unilaterally cut employee compensation at the conclusion of 2020.").

Courts are loathe to strike, "allegations that supply background or historical material or other matter of an evidentiary nature . . . unless they are unduly prejudicial to the defendant." *See e.g.*, *Gregory Wayne Designs, LLC v. Lowry*, No. 24-CV-2109, 2024 WL 3518584, at *9 (S.D.N.Y. July 24, 2024). While unflattering to BSA and Baum, Mahoney's allegations regarding Baum's alleged poor management of the firm, his purported misuse of PPP funds, and the implications this had on the payroll and employee satisfaction, serve to supply the type of "background or historical material," that may be relevant to the Court when assessing the case in its entirety. *See Low*, 2012 WL 173472, at *8 (allowing allegations that have some "bearing on the relevant issues" to survive).

Additionally, several of BSA's claims, namely breach of contract and breach of fiduciary duty, involve Mahoney's solicitation of his working group. Compl. ¶¶ 43, 79. Mahoney alleges that all three employees will "testify at deposition" that they "left BSA of their own volition, due to among other things, Mr. Baum's abusive managerial style, mismanagement of the firm, and

conduct related to the PPP Loan proceeds." Countercls. ¶ 62; *see also Thomas v. NASL Corp.*, No. 99-CV-11901, 2000 WL 1725011, at *11 (S.D.N.Y. Nov. 20, 2000) (holding that when "alleged facts . . . provide background context for the events at issue . . . [they] should not be stricken"). If true, the allegations BSA seeks to strike relate to its purported mismanagement of the firm and the PPP Loan, *see* Countercls. ¶¶ 2, 3, 29–45, which provide context for the working group's independent motivation for leaving BSA. Accordingly, these allegations are sufficiently relevant to BSA's claims to survive a motion to strike. *Cf. Gregory Wayne Designs, LLC*, 2024 WL 3518584, at *9 (retaining allegations that that are "immaterial to the dispute" since they supplied "background or historical material").

Finally, BSA seeks to strike certain allegations because they suggest participation in criminal conduct. While "[a]llegations may be stricken . . . where they have criminal overtones," *G-I Holdings, Inc.*, 238 F. Supp 2d at 555, the mere fact that allegations suggest a party's participation in illegal conduct does not, standing alone, justify striking allegations. *See Oram v. SoulCycle LLC*, 979 F. Supp. 2d 498, 511 (S.D.N.Y. 2013). Given the relevance of the allegations to the claims and quasi-contract claim at issue, moreover, the fact that some of Mahoney's allegations have criminal overtones, which may be prejudicial to BSA, does not overcome the "stringent" "standard that must be met in order to strike material." *Hunter v. Palisades Acquisition XVI, LLC*, No. 16-CV-8779, 2017 WL 5513636, at *9 (S.D.N.Y. Nov. 16, 2017); *see, e.g.*, *Kossoff v. Felberbaum*, No. 14-CV-1144, 2014 WL 1814030, at *8 (S.D.N.Y. May 7, 2014) (refusing to strike allegations about a defendant's Bar sanctions, disciplinary proceedings, and misconduct in a case about their failure to pay a law firm since, "[h]owever inflammatory," the allegations were relevant to the case). BSA's motion to strike paragraphs 2, 3, and 29–45 of the Counterclaims is therefore denied.

### B.  Allegations of Unrelated Wage-and-Hour Violations

BSA also seeks to strike paragraph 23 of the Counterclaims, because it suggests that the company committed wage-and-hour violations purportedly unrelated to the case at bar. The Court again disagrees that it should be stricken. In relevant part, paragraph 23 of the Counterclaims alleges that, "Within his first year at Bay Street, Mr. Mahoney also insisted that Mr. Baum increase salaries for support staff, after learning that Mr. Baum had previously paid several individuals less than minimum wage." Countercls. ¶ 23. BSA asserts that these allegations have no bearing on any relevant issues, pointing to cases in which "allegations of statutory violations suffered by non-parties to the ligation" were stricken. *See* BSA's Reply at 9–10. It is true that the allegation has "criminal overtones", *G-I Holdings, Inc.*, 238 F. Supp 2d at 555, and the connection between the alleged underpayment of support staff sixteen years ago and the claims at issue now is attenuated. Nonetheless, the Court finds that paragraph 23 provides useful background material that speaks to a pattern of alleged financial mismanagement related to Mahoney and his working group's decision to depart BSA for CZP. Mahoney's Br. at 15; Countercls. ¶ 61. For the reasons stated above, the Court denies BSA request to strike paragraph 23 of the Counterclaims. *See Gregory Wayne Designs, LLC*, 2024 WL 3518584, at *9.

### C.  Allegations Regarding Character or Speculation About the Motivation for the Alleged Breach of Contract

The last tranche of allegations that BSA seeks to strike encompasses "allegations regarding character," its purported "motivation for the alleged breach of contract," and its motives for bringing suit. BSA's Br. at 10–12. BSA's motion to strike these allegations is also denied.

BSA asserts that the allegations contained in paragraphs 25–28 and 47–50 of the Counterclaims—which concern Mahoney's desire for an equity stake in BSA and Baum's refusal to share BSA's financial information with Mahoney, as well as assertions about BSA's alleged

mishandling of PPP funds—portray Baum and BSA as cheap or "miserly" and should be stricken since they do not assert facts that can be litigated in this case. *See* BSA's Br. at 10; *Low*, 2012 WL 173472, at \*1; *see also* Countercls. ¶¶ 25–28 ("Mr. Mahoney raised the matter of equity partnership at Bay Street repeatedly over the next twelve years, but Mr. Baum consistently rebuffed Mr. Mahoney's partnership requests, ignored them, or simply dismissed them to be dealt with at an unspecified future date."); *id.* ¶¶ 47–50 ("Confirming Mr. Mahoney's impression that he was not being taken seriously . . . Mr. Baum finally presented Mr. Mahoney . . . with a disappointing and uncompelling partnership plan, offering Mr. Mahoney a meager 5% stake in the company."); *id.* ¶¶ 161–62 ("Bay Street's Complaint has been submitted in bad faith at Mr. Baum's express direction, specifically to harass Mr. Mahoney and to facilitate Mr. Baum's retention of the monetary windfall resulting from Bay Street's breach.").

Mahoney's unfavorable characterizations of his former employer are relevant to this litigation as a whole. Mahoney frames BSA's continual rebuffs of his interest in attaining equity partnership as central to his "consider[ation of] moving on from BSA," Mahoney's Br. at 3, making the allegations in paragraphs 25–28 and 47–49 relevant background or historical material. These allegations also bear on the issues in dispute, particularly the reasons Mahoney and his working group departed the company. *See Gregory Wayne Designs, LLC*, 2024 WL 3518584, at \*9; *Burger*, 684 F. Supp. 46 at 52 (citing *Gleason v. Chain Serv. Rest.*, 300 F. Supp. 1241, 1257 (S.D.N.Y. 1969)).

Turning briefly to BSA's concern that the allegations were intended to or had the effect of "reflect[ing] cruelly on [its] moral character," *see* BSA's Br. at 10 (quoting *Burger*, 684 F. Supp. 46 at 52), the Court does not find that Mahoney's characterizations rise to the level of "*ad hominem* character attacks" found in cases where allegations were stricken. *Low*, 2012 WL 173472, at \*10.

Unlike in such cases, the allegations at issue also bear in a meaningful way on the claims in the case. *See id.* (striking "allegations that [the defendant] was 'lucky' enough to be 'born into extreme wealth,' and that he was 'home-schooled and had not distinguished himself in any way,'" and "statements that 'no expression better describes' [the defendant's] actions than '[w]hat's mine is mine, and what's yours is mine,' and that [the defendant] is 'not the type of person who gives back, shares or pays forward'").

The Court next turns to the motion to strike paragraph 50 of the Counterclaims, which describes Baum as "notoriously cheap." While the Court agrees with BSA that the characterization is particularly unflattering, it remains relevant to BSA's trade secrets claim, given that Mahoney is alleged to have used his personal external hard drive, and "an undisclosed personal device," to "exfiltrate the contents of his BSA-issued laptop." Compl. ¶¶ 30, 69. In his Counterclaims, Mahoney justifies his use of these personal devices, explaining that, in 2022, he purchased a new personal laptop to replace both his BSA desktop—which "regularly crashed, resulting in data loss"—and a work issued laptop—which was "was old and insufficient." Countercls. ¶¶ 28, 51–53. Although the allegation in paragraph 50 that Baum was "cheap" somewhat colorfully tees up the following paragraphs, it is key to Mahoney's justification of his reliance on personal rather than firm-issued devices, which may become relevant to his defense of BSA's Defend Trade Secrets Act claim. *See* Countercls. ¶¶ 50–57.

Furthermore, the deployment of unfavorable and even prejudicial language does not warrant granting a motion to strike if those allegations are relevant to the proceedings as they are here. *See United States v. Bellomo*, 263 F. Supp. 2d 561, 585 (E.D.N.Y. 2003) ("[I]f evidence of the allegation is admissible and relevant to the charge, then regardless of how prejudicial the language is, it may not be stricken."); *Gregory Wayne Designs, LLC*, 2024 WL 3518584, at *9

("Material that does not cast a positive light upon the defendant" is not necessarily "so unduly prejudicial to the defendant that striking the paragraphs is warranted"). "[F]or the motion to strike to succeed on this basis," the Counterclaims would have needed to do more than include mere "negative characterizations" that were not unduly prejudicial. *Id.*

Finally, BSA characterizes the allegations in paragraphs 161 and 162 of the Counterclaims as speculation about its motivations in bringing this action against Mahoney and its reasons for purportedly breaching the Transition Agreement. BSA's Br. at 9 ("These 'motive' allegations have no bearing on the main dispute of fact – whether Mahoney did 'continue working towards [the] completion . . . or whether he handed them off to BSA's employees to complete."). Both paragraphs indeed allege theories as to why BSA purportedly breached the Transition Agreement and why it filed suit. For this very reason, they are relevant to the quasi-contract claim. Countercls. ¶ 162 ("Baum . . . is particularly motivated to retain as large a share of the substantial funds he owes Mr. Mahoney" because of his 'financial headwinds.'"); *id.* ¶ 161 ("Bay Street's Complaint has been submitted . . . to facilitate Mr. Baum's retention of the monetary windfall resulting from Bay Street's breach.").

While "motive is not an element of a claim for breach of contract," a party's "[m]otive and financial interest are relevant to credibility and bias." *Tang Cap. Partners, LP v. BRC Inc.*, 757 F. Supp. 3d 363, 406 (S.D.N.Y. 2024). Since a witness's credibility is relevant, "issue[s] regarding defendant's intent when [they] breach[] [a] contract" may survive a motion to strike. *Avnet*, 684 F. Supp. at 817. For these reasons, BSA's motion to strike is denied with respect to paragraphs 161 and 162.

## CONCLUSION

For the reasons articulated above, the Court denies BSA's motions to dismiss and to strike in their entirety. The Clerk of Court is respectfully directed to terminate the motion pending at Dkt. No. 23.

SO ORDERED.

Dated:      September 30, 2025
            New York, New York

_____
Ronnie Abrams
United States District Judge